# Ellen E. Wright's Appeal.

99   425
147   526

99        425
f   25 SC ²339

1. A., the president of a railroad company, induced B., a stockholder therein, to surrender to him her shares of stock, together with blank powers of attorney to transfer the same, by means of certain false representations that the same were needed to aid the company. A. had no express authority to borrow the stock, and the corporation had sufficient funds. A. gave to B. his individual due-bill, transferred the stock, and embezzled the proceeds. Subsequently, he fraudulently combined with the other officers of the company, to issue stock in excess of the charter limit. Of this over-issued stock he awarded to B. a number of shares, equal to the number of shares of valid stock entrusted to him by her. In a proceeding in equity to determine the relative rights of B. and the company as to said last named shares,—*Held*, that the company was not liable for the acts of its president, A., in the above transaction ; that he was to be considered as having acted therein as the agent of B., as much as the agent of the company ; that B., therefore, must bear the loss resulting from his embezzlement, and that the over-issued shares in her hands were invalid and valueless.

2. Two elements among others must be present in order to constitute an estoppel in pais; the party to whom the representation is made, must have been ignorant of the truth of the matter, and have been induced to act upon it.

3. In the above case it appeared, that after the transfer by A. of the original valid shares intrusted to him by B., the company continued to pay dividends on such shares to B. *Held*, that B. was chargeable with knowledge of the fact that her shares had been transferred, and that, on account of this fact, and also because it appeared that she had not been induced to act to her prejudice, or to part with anything on the strength of such dividends, the company was not estopped from denying its liability to her.

January 24, 1882. Before Sharswood, C. J., Mercur, Gordon, Paxson, Trunkey, Sterrett and Green, JJ.

Appeal from the Court of Commom Pleas No. 2, of *Philadelphia county:* In Equity: Of January Term 1881, No. 112.

Appeal of Ellen E. Wright from a decree of said court, dismissing her exceptions to the report of a Master in the matter of a cross-bill filed by her, in a cause wherein Sarah Swain and William M. Baugh were complainants, and the West Philadelphia Passenger Railway Company, its officers and directors and others, were the defendants.

The original bill in equity, filed October 20th 1877, set forth that the complainants were stockholders in the West Philadelphia Passenger Railway Company ; that eight thousand shares of stock of the par value of $50 each, had been issued by the said corporation, pursuant to its charter ; that in the year 1869, a combination was made between the president, treasurer and secretary of the said company to issue fraudulent certificates of stock, and that, in pursuance of said conspiracy, an unknown

number of certificates were issued, for which the company had received no consideration, and that its said directors were about to recognize the validity of such issue.

The bill prayed a decree that the certificates of such over-issued stock be declared null and void, and be surrendered to the company to be canceled.

The answer of the defendant company and its directors admitted the averments of the bill, made discovery of the names of the holders of the over-issued stock, so far as they had knowledge, and averred that the directors deemed it expedient, if the company be responsible to any holder of said over-issued stock, to treat them as holders of genuine stock.

The railway company afterwards filed a cross-bill against the parties who had appeared by counsel (among them Ellen E. Wright, the appellant in this case), setting forth that the certificates of over-issued stock, though fraudulently issued, were in form regular, sealed with the seal of the corporation, and duly attested by the proper officers; that if any liability existed on the part of the corporation to the holders of such fraudulently issued certificates, it was either an obligation to treat them as holders of valid stock, or to compensate them to the extent of the value given by them therefor, and submitting themselves to the order of the court in the premises.

Ellen E. Wright thereupon filed both an answer and a cross-bill, the latter averring that she owned 1722 shares of the capital stock, and held, as evidence of her title, eight certificates issued by the company in the usual form, taken out of the certificate book, and all under its seal duly attested by the genuine signatures of its president, secretary and treasurer; that the certificates for 1677 of the said shares were handed, on February 25th 1876, to her by John S. Morton, president, in lieu of other certificates for various amounts which she had previously held, a considerable number of these former certificates having been for a small number of shares; that the company had paid her dividends on these shares to the amount of $34,220; that recently the corporation had refused to recognize her shares as valid on account of frauds committed upon the corporation; that the plaintiff was ignorant of any such frauds, and that her title to such shares is in no way affected thereby. The cross-bill prayed a decree that complainant is the absolute owner of the 1722 shares of stock, and that the corporation be compelled to recognize her as such.

The case was referred to David W. Sellers, Esq., as Examiner and Master, who reported the facts to be as follows: Ellen E. Wright, the defendant, who is the paternal aunt of John S. Morton, delivered certificates to him in all for 1780 shares of valid stock, taking his individual due-bill therefor, in cases

[Wright's Appeal.]

in which the same have been produced, for 551 shares on February 21st 1867 ; for 443 shares on January 15th 1867, and for 511 shares on July 8th 1867. These certificates were accompanied with executed powers of attorney in blank irrevocably constituting an attorney to sell, assign, and transfer. Under these powers, 1380 shares, which are now the number in dispute, were sold and transferred to parties who are holders for value and without notice. The delivery of those certificates was explained by defendant as follows : " The first he [Morton] ever got, I think, he borrowed money for me on my stock, and then I paid off the loan, and he asked me if he should have it for a while, and I told him yes, he should, and then he gave me securities of different kinds. At different times he borrowed from me in that way. He said he wanted to pay for the cars and for the improvements on the road. I had no idea that it was for himself ; I never thought such a thing. He would tell me all about how much he was laying out on the road, and then he would ask me for the securities. I thought it was for the road ; I never thought it was for anything else."

The manner in which she received the present certificate was thus explained by her :—

" He [Morton] came to see me. No one knew that he had my securities. We were alone together, and I said that I would like to have my securities back, that I thought it was time. Well he says, Aunty, I will give them to you ; you have some very small certificates ; would you not like to have them changed ? I said, no, that I would rather not have them changed, as they had my husband's name on them, but he over-persuaded me, and I said yes, you may change them, and put them in a large certificate, and so I gave them to him—200 or 300 shares. They were all in small certificates ; they were a good many of $50 each. The next morning he gave me all the certificates back."

The Master's report concluded as follows :—

" The Master finds as a fact that this defendant delivered the certificates upon the belief that Morton would use them for the benefit of the railway company, and that this belief was confirmed by the fact that she almost always received the dividends thereon by the corporate checks up to the last time before the crime of Morton became known, and when she received individual checks she was informed that ' the company would be short of money.'

" The Master finds also as a fact that the company had not authorized Morton to borrow certificates for its use, and that its treasury was sufficient for its needs, and that the money realized in the sale of the valid shares was not applied to corporate uses.

" As the powers in blank for the transfer of stock are valid (Association *v.* Sendmeyer, 14 Wright 67), the title of Ellen E. Wright thereto was divested by the intervention of a purchaser without notice (Turnpike Co. *v.* Ferree, 2 C. E. Greene 117 ; McNeil *v.* Bank, 46 New York 325 ; Finney's Appeal, 9 P. F. Smith 398), and the corporation incurred no liability by permitting the transfer : Pennsylvania Railroad Appeal, 5 Norris 81. Mrs. Wright having, therefore, authorized the sale of the valid certificates, she is bound in law as though she received the money which her attorney received, and therefore she is not a holder for value of the present certificates to the extent of 1380 shares, as she had given nothing therefor. The valid certificates for 294 shares which she gave Morton immediately before the receipt of the present certificates have been substituted by certificates which to that extent are recognized. No loss, therefore, has accrued to her by the representation contained in the present certificate held by her.

" It is, however, argued the embezzlement of the proceeds of sale should be borne by the company, inasmuch as the securities were obtained from her on the statement by Morton made and by her believed that the same were for the use of the company; although the Master has found the fact to be that such statement was made and such belief existed, yet he holds that unless there was affirmative proof that Morton had authority to borrow securities for his company, his conduct in that regard is wholly outside of his agency. She was in law bound to know this, and an inquiry of an individual officer would have been unavailing.

" Nothing short of a by-law or resolution of the board of directors would have in law justified the loan at the risk of the corporation. There was no corporate act shown her on which she could have acted under the shield of an equitable estoppel. It is only where the act relied upon is within the usual powers of the officer that the abuse is at the peril of his principal : all conduct outside of his powers is individual, and creates no other right or remedy than he can individually afford.

" The Master, therefore, will decree formally that all of the certificates held by her be surrendered, and that the railway company issue to her a certificate for 342 shares of the valid stock of the company."

Exceptions to the Master's report was filed by Mrs. Wright, but were dismissed, the Court saying : " We have been impressed with the very great hardship of Mrs Wright's case, but think that Mr. Morton was as much her agent as that of the company, and that the burden of his fraudulent acts must be left where he placed it."

The following decree was entered :—

[Wright's Appeal.]

" That the exceptions filed by Ellen E. Wright be dismissed ; and that as to the crctificates of stock of the said West Philadelphia Passenger Railway Company, numbered 1951, 1952, 1953, 1954, 1955, 1956, 2020 and 2048, for seventeen hundred and twenty-two shares thereof, now standing in the name of Ellen E. Wright, a certain portion, viz. : three hundred and forty-two of said shares, are component parts of the capital stock of said West Philadelphia Passenger Railway Company, and the latter upon surrender for cancellation of certificates for the like number of shares shall give a new certificate therefor ; that as to the residue, viz. : thirteen hundred and eighty of said shares, the company never received any value therefor nor authorized their issue ; that the same were procured by the said John S. Morton for the said Ellen E. Wright, acting as her agent and not as agent for the said railway company, in lieu of certain other shares previously held by her ; that the said Ellen E. Wright is not a purchaser for value of said shares, and shall, forthwith, deliver the certificates for said shares to to the said Passenger Railway Company to be cancelled, and that she be enjoined from transferring or in any way disposing of the same, or making any claim against the said Passenger Railway Company by reason thereof."

Mrs. Ellen E. Wright thereupon took this appeal, assigning for error the above decree.

*Samuel C. Perkins*, and *George Junkin*, for the appellant.—Morton, the president of the corporation, in borrowing the appellant's stock expressly for the purposes of the corporation, was acting within the scope of his powers as agent of the corporation. A corporation has, in matters of agency, the same liberty of action as belongs to a natural person capable of business. It is bound by the parol contracts of its duly constituted agents, just as individuals are bound. And it is not necessary that there should be the seal of corporation in order to evidence the power to act. Nor need the party dealing with such officer require a resolution of the board of directors, or a by-law : Wharton on Agency, §§ 59, 670, 671. The corporation is liable for a loan to a president of a corporation, when the lender is induced by the representation of the president to believe that the transaction is with the corporation and for a purpose within the scope of its business, even though he had no authority to make such representation : Central Bank *v.* Empire Co., 26 Barb. (N. Y.) 23 ; Mitchell *v.* Deeds, 49 Ill. 416 ; Dougherty *v.* Hunter, 4 P. F. Smith 380. The master found that for a series of years, the directors of the corporation intrusted all the financial matters of the company to Morton, including the borrowing of money. In such case, the

[Wright's Appeal.]

corporation is bound as if authority to borrow had been
expressly conferred : Phillips *v.* Campbell, 43 N. Y. 271. No
inquiry by Mrs. Wright would have informed her of the want
of Morton's authority, for the treasurer and secretary, to
whom she would have been referred, were co-conspirators
with Morton.

But the company are estopped from denying the validity of
the certificates by the fact that for years after the fraudulent
over-issue, the company paid her numerous dividends on such
over-issued stock held by her by their own regularly drawn
checks. The company thus ratified Morton's original borrowing
and the subsequent issue of certificates to her, and lulled her to
security, by their continuing affirmation that she was lawfully
entitled to the stock evidenced by her certificates. It is not
necessary that Mrs. Wright, to claim the benefit of the equitable
estoppel, should have acted affirmatively upon it. It is enough
that she was deprived of the opportunity to retrieve her position :
Knights *v.* Wiffen, Law Rep. 5 Q. B. 660 ; Bassett *v.* Holbrook,
24 Conn. 453 ; Cocks *v.* Masterman, 9 Barn. & Cress. 902 ; Bidwell
*v.* Pittsburgh, 4 Norris 412 ; Farmers' and Mechanics' Bank *v.*
Bank, 16 N. Y. 125 ; N. Y. & N. H. Railroad Co *v.* Schuyler,
34 N. Y. 30 ; Willis *v.* Darby R. R. Co., 6 W. N. C. 461 ; Bank
of Kentucky *v.* Schuylkill Bank, 1 Pars. Eq. Cases 180 ; Blair
*v.* Wait, 69 N. Y. 113.

*Joseph R. Rhoads* and *John G. Johnson,* for the appellees.
—The master found as a fact that Morton was Mrs. Wright's
agent, and that the company had not authorized him to borrow
her certificates for its use. This is not the case of an implied
power to an officer of a corporation to borrow money. Morton
borrowed Mrs. Wright's railway stock as he borrowed United
States bonds and other securities, giving his individual due-bill
therefor. This was entirely out of the ordinary course of busi-
ness of the corporation, and the case falls within the rule laid
down in Bank of Kentucky *v.* Schuylkill Bank, 1 Pars. Eq. Cases
248, and Penna. R. R. Co.'s Appeal, 5 Norris 80.

There was no estoppel, because the appellant did not act or
in any way alter her position by reason of the supposed admission
by the company of the validity of the stock by the payment of
dividends thereon, nor was she misled to her injury : Bigelow
on Estoppel (2 ed.) 437 ; Helser *v.* McGrath, 2 P. F. Smith
534 ; Musser *v.* Oliver, 9 Harris 362 ; Dewey *v.* Field, 4 Metc.
381.

Mr. Justice PAXSON delivered the opinion of the court,
February 27th 1882.

The amount involved in this case is large, and it is apparent

that a heavy loss must fall upon one of two innocent parties. Both appear to have reposed blind confidence in John S. Morton, who is the central figure in the unpleasant story of speculation and dishonor which this record unfolds.

The learned counsel for the respective parties have furnished us with able and exhaustive arguments upon the points presented, and we have no difficulty in arriving at our conclusions upon the law of the case.

The assignments of error raise but two questions: 1st, was Morton the agent of the company or of the appellant? and, 2d, are the company estopped from denying the validity of the shares for which the fraudulent certificates were given to appellant?

The learned court below, while recognizing the great and admitted hardship of the appellant's case, held, nevertheless, that "Mr. Morton was as much her agent as that of the company, and that the burden of his fraudulent acts must be left where he placed it."

This view was quite as favorable to the appellant as she had a right to expect. Morton was undoubtedly her agent. The learned Master finds and reports as a fact, that she delivered to Morton 1780 shares of valid stock, taking his individual duebill therefor. These certificates with executed powers of attorney in blank irrevocably constituted an attorney to sell, assign and transfer the same. Under these powers, 1380 shares, the number in dispute, were sold and transferred to parties who are holders for value and without notice. It is, therefore, too clear for argument that as to the shares thus sold, Morton was her agent and attorney expressly authorized in writing under seal, to sell or pledge the stock. And having sold it, he was liable to account to her for the proceeds. But it is said he borrowed the stock for the company of which he was the president, and that he was the agent of the company for that purpose. Upon this subject the master finds "that the company had not authorized Morton to borrow certificates for its use, and that its treasury was sufficient for its needs, and that the money realized in the sale of the valid shares was not applied to corporate uses." It was not alleged that this finding of fact was not correct. Indeed it was not attempted to be shown that Morton had any express authority from the company to borrow the appellant's stock, or that one dollar of the proceeds thereof had ever gone into its treasury. It was contended, however, that he possessed such implied power; that, from either the assent or the supineness of the directors, he had, as president of the corporation, drawn unto himself all of its powers, and directed all of its affairs without control or restraint from any one. There is no doubt that in the management of the business of

the corporation, Mr. Morton was permitted to exercise large powers. It is also true that the powers of a president to bind his company are broad, and such powers may be implied, like those of any other agent, from a known course of dealing. Thus it has been repeatedly held that if a corporation permits its agent to exceed his powers from time to time, and subsequently ratifies his acts, it cannot afterwards set up such excess of authority as against a person who has been deceived by it. This principle is so familiar that a reference to the cases is unnecessary. No such course of dealing existed in this case. There is no evidence that Mr. Morton ever borrowed a dollar for the company. He did not even borrow the appellant's stock for the company. He borrowed it for himself, and gave his individual note therefor, with his own securities as collateral. It is true, as the Master finds, he told the appellant that he intended to use the money for the company, but this naked falsehood did not alter the legal effect of the transaction, however much the appellant may have been deceived and misled by it. Had this, in fact, been a loan for the corporation, though unauthorized, and had the money gone into its treasury, we would have had an entirely different question before us.

The implied powers of the president or agent of a corporation, must be considered in connection with the usual and legitimate business of such corporation. Had Mr. Morton made a contract for the lease of an office, as in Steamboat Company *v.* McCutcheon, 1 Harris 13, or to purchase horses, cars or material needed for the purposes of its business, it might have been binding upon the corporation because it would have been among the implied powers of its president. So far the cases go; but I know of no authority which holds that where he borrows money for himself upon his own note he can bind the corporation therefor by falsely representing that he wants the money for his company. The authorities are the other way. It is sufficient to cite Angell & Ames on Corporations §§ 220 to 297; Martin *v.* Great Falls Manufacturing Co., 9 N. H. 451.

This brings us to the second branch of the case. Was the company estopped? The appellant contends that because the dividends continued to be paid upon her stock, it was a recognition by the company of her ownership of it.

This may be disposed of in a few words. The case lacks the essential elements of an estoppel. A party is not estopped or concluded by his own admissions unless another person has been induced by them to alter his condition: Heane *v.* Rogers, 9 B. & C. 577; Newton *v.* Liddiard, 12 Q. B. 925. In Bigelow on Estoppel, p. 437, it is laid down that the following elements among others must be present, in order to work an etoppel: 1. The party to whom the representation was made

[Wright's Appeal.]

must have been ignorant of the truth of the matter; and, 2. The other party must have been induced to act upon it. Both these essential elements are lacking in this case. The appellant to whom the dividends were made is chargeable with knowledge of the fact that Morton, her agent and attorney, had transferred the stock. And secondly, there is no evidence that the appellant was induced to act on account of the dividends. She parted with nothing on the strength of them. Her stock was gone, hopelessly gone, in the ruin which overtook John S. Morton. There is no evidence that her condition was in any way changed by the receipt of the dividends. If changed at all, it was for the better by just their amount.

Aside from this, until the discovery of Morton's frauds the appellant was entitled to the dividends. The stock was pledged, not sold. In such case the dividends are paid to the pledgor. This is the case, even if the pledgee has had the stock transferred into his own name. He collects the dividends and pays them to the pledgor. Morton from time to time received orders for the dividends from the pledgees, and when presented to the company the latter was in duty bound to pay them to the appellant. It will be observed there was no double payment—to the appellant and to the pledgees.

It does not help the case of the appellant, that Morton subsequently gave her certificates of stock signed by the proper officers and attested by the seal of the company, for those he had borrowed and converted to his own use. Such new certificates were a fraudulent over-issue, and the result of an unlawful and criminal conspiracy between Morton and the other officers concerned therein. The appellant gave the company no value for them. The case is one of clear embezzlement on the part of Morton; and much as we regret the loss it will entail upon the appellant, we see nothing that would justify us in throwing the consequences of her misplaced confidence upon the appellees. The cases of Association v. Sendmeyer, 14 Wright 67; Finney's Appeal, 9 P. F. S. 398; and Pennsylvania Railroad Company's Appeal, 5 Norris 102, show where the loss should fall in such a case as this.

The decree is affirmed, and the appeal dismissed at the costs of the appellant.